## STATEMENT OF FACTS

On May 8, 2024, the Homeland Security Investigations (HSI) Washington, D.C. High Intensity Drug Trafficking Area (HIDTA) group executed a controlled delivery and anticipatory search warrant at address xxx X Xxxxxx XX, Washington, D.C. (the "TARGET PREMISES"). The controlled delivery involved a United Parcel Service (UPS) package which originated in China, which was intended for the TARGET PREMISES, and which previously contained approximately 122 grams of a substance which field tested presumptive positive for N,N-Dimethylpentylone hydrochloride; otherwise known as dipentylone[1], a Schedule I controlled substance. The TARGET PACKAGE was addressed to "Miguel Sanchez".

Before engaging in the controlled delivery, HSI removed the narcotics from the TARGET PACKAGE and replaced the narcotics with fake narcotics or sham. On the late morning of May 8, 2024, an undercover law enforcement officer delivered the TARGET PACKAGE to the TARGET PREMISES and left the package outside an exterior door which led into an inner hallway in the building, where the actual door to the TARGET PREMISES apartment was located. Your affiant maintained a direct line of sight on the TARGET PACKAGE and additional law enforcement officers conducted surveillance in the nearby area. A little more than one hour later, agents observed an adult male believed to be a resident of the TARGET PREMISES exit the outer door of the building and depart the area without touching or appearing to look at the TARGET PACKAGE. Shortly afterwards, agents noticed that the TARGET PACKAGE was no longer visible on the ground outside of the outer door to the TARGET PREMISES, although agents did not observe anyone else approach the apartment entrance or the package. Based on these observations, your affiant determined it was probable that someone had quickly opened the outer door leading to the TARGET PREMISES and retrieved the TARGET PACKAGE, bringing it inside.

Agents subsequently knocked and announced their presence at the door to the TARGET PREMISES. Shortly afterwards, Shelvin Jovan BARNES came to the door and spoke with investigators. Your affiant asked BARNES if he had retrieved a package from outside the door, to which BARNES replied that he had and that he had brought the TARGET PACKAGE inside of the TARGET PREMISES. Based on the previous surveillance observations as well as BARNES' statements, your affiant concluded that BARNES had taken possession of the TARGET PACKAGE and brought it inside of the TARGET PREMISES. As such, agents detained BARNES and executed the anticipatory search warrant of the TARGET PREMISES. Immediately upon entering the TARGET PREMISES, agents observed the TARGET PACKAGE on the kitchen counter.

Your affiant and another HSI Special Agent interviewed BARNES in the living room of the residence as additional agents conducted a search of the apartment. Your affiant advised BARNES of his *Miranda* rights, which BARNES acknowledged he understood and then agreed to speak with

---

[1] Dipentylone, also known as N,N-dimethylpentylone, is a synthetic cathinone that produces psychostimulant effects similar to cathinone. Dipentylone functions by increasing the concentration of dopamine, serotonin, and norepinephrine in the central nervous system similar to amphetamines. As a positional isomer of pentylone, dipentylone is controlled in Schedule I of the Controlled Substance Act. *See* https://www.govinfo.gov/content/pkg/FR-2024-02-08/pdf/2024-02593.pdf

investigators without an attorney present. Throughout several hours of interviewing inside of the apartment, BARNES made the following statements, in sum and substance:

- BARNES identified the TARGET PREMISES as his residence and claimed at least two other family members lived there with him. Agents found significant indicia of occupancy bearing BARNES' name throughout the residence which further established his residency at the TARGET PREMISES, to include but not limited to, mail matter, court paperwork, prescription medication bottles, pay stubs, and a lease agreement.
- BARNES claimed to not know exactly what was inside of the TARGET PACKAGE but believed it may contain "Molly." Your affiant knows through training and experience that dipentylone is often sold on the street as "Molly".
- BARNES believed the TARGET PACKAGE originated from a foreign country.
- BARNES had received several previous packages of the same drug to the TARGET PREMISES.
- BARNES identified several types and quantities of additional drugs in the residence and claimed knowledge and possession of them, to include drugs he referred to as "Booka" and "K2".
- BARNES identified a specific upstairs bedroom as his own (hereinafter, "BEDROOM 1") and revealed that he had a firearm located somewhere within BEDROOM 1. BARNES knew it was unlawful for him to possess a firearm as he did not have a license to carry.

As agents interviewed BARNES, additional agents searched the living room and discovered a blue plastic bin which contained numerous items of drug paraphernalia and bulk narcotics, to include the following. For each drug field test, agents used an MX908 Portable Mass Spectrometer device:

- Two bags containing a bulk mixture of light-colored powder and a rock-like substance; one with a gross approximate weight of 797 grams and one with a gross approximate weight of 69 grams, for a total of approximately 866 grams (gross weight) of a substance which later field tested presumptive positive for ADB-BUTINACA, a Schedule I Controlled Substance. ADB-BUTINACA is a synthetic cannabinoid and is also known as "K2" or "Spice".
- Two bags containing a bulk mixture of a light-colored rock-like substance; one with a gross approximate weight of 214 grams and one with a gross approximate weight of 164 grams, for a total of approximately 378 grams (gross weight) of a substance which later field tested presumptive positive for a combination of AH-7921 and U-47700; both Schedule I Controlled Substances and synthetic opioids. One of these two bags had the word "BOOKA" written on the outside in black permanent marker. ("BOOKA" is the street name of the unspecified drug BARNES referenced earlier in the interview). The other bag had the numbers "154.25" written on the outside of the bag. BARNES stated that these numbers, as well as similar numbers written on the outside of numerous other empty plastic bags found throughout the residence, represented the weight of drugs placed in the bags, which were intended for distribution.
- A box of gallon-sized plastic zipper bags.
- A digital scale.
- Several plastic jugs and plastic measuring cups which contained white-colored residue

- on the interior.
- A metal spatula.
- A "3M" brand protective face mask with air filtration canisters affixed to it.
- A pair of used, pink-colored industrial rubber gloves.
- Numerous empty plastic zipper bags, to include bags with numbers written on the outside in marker; likely representing the weight of some type of drug that it previously contained, based on BARNES' earlier statements.

Pictures of some of the seized items are depicted below:



**Left to Right: One bag of suspected ADB-BUTINACA (approximately 797 grams) and one bag containing a combination of suspected AH-7921 and U-47700 (approximately 214 grams).**



**Suspected drugs and drug paraphernalia located inside of a blue plastic bin in the living room of the TARGET PREMISES.**



**Protective face mask with and rubber gloves located in the blue plastic bin in the living room.**

Based on training and experience, your affiant knows that the above items are consistent with an intent to manufacture, process, and distribute large quantities of controlled substances.

During the search, agents also discovered a 35-pound box of "Evergreen Herbs"-brand Mullein tea leaves, approximately 16 gallons of Acetone (to include 11 single-gallon sized metal containers, as well as a five-gallon drum), and a large plastic bin containing an unknown substance that looked similar to the tea leaves. During his interview, BARNES explained that all of the suspected drugs and drug paraphernalia located in the blue bin were used for the purpose of cutting, mixing, and distributing drugs. BARNES explained that the Acetone and tea leaves were used to mix together with drugs, and that the unknown substance[2] in the clear bin was the end result of such a mixture.



**Containers of Acetone found in the living room and throughout the first floor of the residence.**

During a search of BEDROOM 1 (which BARNES identified as his own), agents found numerous items identifying the room as BARNES', to include prescription medication bottles bearing his name, lease paperwork for the TARGET PREMISES bearing his name, court paperwork, and a notebook containing numerous handwritten notes, to include a page with the word "*Nuke*" written on it; BARNES' self-identified alias. From underneath the mattress, agents seized a Beretta 9mm pistol, bearing serial number A117984X. The firearm did not have a round in the chamber, but had a magazine inserted which contained numerous rounds of 9mm ammunition. Approximately two feet from the firearm, located on the floor of the bedroom and against the wall, agents discovered a U.S. Postal Service (USPS) package addressed to "Miguel Sanchez" at the TARGET PREMISES; the same fictious name listed on the TARGET PACKAGE. Inside of the box, agents discovered a clear plastic

---

[2] Agents were unable to obtain a reliable field test result from this substance and will submit it to a drug laboratory for in-depth analysis.

bag containing approximately one kilogram of bulk, white-colored powder. BARNES stated he initially expected that this box would contain the same type of drugs that he expected to find in the TARGET PACKAGE, although he believed the box ultimately ended up containing some sort of non-drug substance like baking soda. Agents conducted a field test of this substance but did not presumptively identify any controlled substances.

From BEDROOM 1, in addition to the firearm and one-kilogram bag of white powder, agents found approximately 10 cell phones; all of which BARNES claimed as his own. Further, within the notebook in BEDROOM 1 that contained BARNES' alias of "Nuke", agents discovered suspected drug ledger notes and apparent rap lyrics which stated, in part, the following:

"*On da blk b\*\*\*h, im juggin it, got dat s\*\*t 4 da low, dope feen in da hallways, u might get smoke, if I dnt got ma gun on me, u might get poke*"

Based on training and experience, your affiant knows that "*juggin*" is a slang term for selling drugs, and that the above lyrics essentially convey a message related to selling drugs while also possessing a firearm and/or a knife by warning drug purchasers (dope feens) that if they get out of line they risk getting shot or stabbed.

Based on the above stated facts, your affiant submits that probable cause exists to charge BARNES with 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense); 21 U.S.C. § 841 (Possession with Intent to Distribute a Controlled Substance – ADB-BUTINACA, AH-7921, and U-47700), and 21 U.S.C. § 846 (Attempted Possession with Intent to Distribute - dipentylone).

Your affiant has not provided every fact known to him during the investigation, but facts sufficient to establish probable cause.

_____
SPECIAL AGENT JULIAN HERMAN
HOMELAND SECURITY INVESTIGATIONS

*Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 9th day of May, 2024.*

2024.05.09
11:13:45 -04'00'

_____
ROBIN M. MERIWEATHER
U.S. MAGISTRATE JUDGE